**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CHERYL TERBUSH-FISHER,

                           Plaintiff,

      v.                                         No. 09-CV-453
                                               (DRH)

MICHAEL ASTRUE, Commissioner of Social
Security,

                           Defendant.

_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| FUSCO, BRANDENSTEIN & RADA, P.C. | VICTOR FUSCO, ESQ. |
| Attorney for Plaintiff | |
| 180 Froehlich Farm Boulevard | |
| Woodbury, New York 11797 | |
| | |
| HON. RICHARD S. HARTUNIAN | SANDRA M. GROSSFELD, ESQ. |
| United States Attorney for the | Special Assistant United States Attorney |
|    Northern District of New York | |
| Attorney for Defendant | |
| 100 South Clinton Street | |
| Syracuse, New York 13261-7198 | |

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

## MEMORANDUM-DECISION AND ORDER

     Plaintiff Cheryl Terbush-Fisher ("Terbush-Fisher") brings this action pursuant to

42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Terbush-Fisher moves for a finding of disability and the Commissioner cross-moves for

a judgment on the pleadings.  Docket Nos. 10, 16.  For the reasons which follow, it is

recommended that the Commissioner's decision be affirmed.

## I. Procedural History

On August 1, 2006, Terbush-Fisher filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of January 1, 2005[1] with a date of last insured on June 30, 2006. T. 47-52, 92, 355.[2]  That application was denied on December 8, 2006.  T. 35-38. Terbush-Fisher requested a hearing before an administrative law judge ("ALJ") and a hearing was held on June 5, 2008.  T. 29; 352-72.  In a decision dated June 26, 2008, the ALJ held that Terbush-Fisher was not entitled to disability benefits.  T. 10-21.  On November 5, 2008, Terbush-Fisher filed a timely request for review with the Appeals Council.  T. 8.  On February 17, 2009, the Appeals Council denied Terbush-Fisher's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 2-7. This action followed.

## II. Contentions

Terbush-Fisher contends that the ALJ erred in (1) failing properly to consider the opinions of her treating physician, (2) failing to re-contact her treating physician to complete Terbush-Fisher's medical history , (3) finding that Terbush-Fisher was not credible concerning her statements of disability, (4) concluding that Terbush-Fisher retained sufficient residual functional capacity (RFC) to perform work, and (5) using the

---

[1] During the hearing, Terbush-Fisher's counsel requested that the onset date be amended from November 2002 until January 2005.  T. 355.  His request was granted. Id.

[2] "T." followed by a number refers to the page of the administrative record. Docket No. 7.

2

medical-vocational guidelines as a framework.

## III. Facts

Terbush-Fisher is currently fifty-three years old and completed high school and one year of college for a program in office management.  T. 90, 355, 357.  Terbush-Fisher's previous work experience included being an administrative assistant and financial manager for the military; a secretary and office manager for a church; and telemarketing.  T. 73-78, 85-86, 358-59.  Terbush-Fisher alleges that she became disabled on January 1, 2005 due to anxiety, obesity[3], and musculoskeletal impairments.  T. 84.

## IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. §

---

[3] Terbush-Fisher is 5'5" tall and weighs 318 pounds.  T. 364.

423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. -4 Civ. 9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

     The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities.  If claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will consider him [or
> her] disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to perform his
> [or her] past work.  Finally, if the claimant is unable to perform his [or her]
> past work, the [Commissioner] then determines whether there is other
> work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial

burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing

Berry, 675 F.2d at 467).

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

## V.  Discussion

## A. Medical Evidence

### 1. Work History

Terbush-Fisher has not engaged in any substantial gainful activity since the onset of disability on January 1, 2005.  T. 15.

### 2. Anxiety Treatment Prior to July 31, 2006

The first accounts of Terbush-Fisher's anxiety occurred during her admission to St. Clare's Hospital in October 2002.  T. 258-60.  While Terbush-Fisher arrived at the emergency room ("ER") for weakness and gastrointestinal issues, she reported a history of panic attacks since 1994.  T. 258.[4]  The hospital staff concluded that Terbush-Fisher suffered from, inter alia, uncontrolled anxiety, and began her on prescription medication for her symptoms.  T. 260.  Terbush-Fisher's anxiety medication was then changed at her request, and she was discharged.  T. 256-57.

In the Fall of 2002, Terbush-Fisher began receiving treatment from a primary care provider, Baptist Medical Care ("Baptist").  On October 28, 2002, Terbush-Fisher reported that she felt less tired and anxious recently, though she had experienced a panic episode earlier in the month for which she was taken to the ER.  T. 311.  On November 11, 2002, Terbush-Fisher was diagnosed with anxiety.  T. 306.  On December 12, 2002, Terbush-Fisher requested a refill and reduction in dosage of her

---

[4] It appears that following the panic attack in 1994, Terbush-Fisher went to the ER again in February of 1995 for feeling faint and weak.  From May to August, 1995, she received counseling services from Christian Counseling.  T. 215-222, 227-29, 253-55, 274-75.

anti-anxiety medication.  T. 304.

On December 12, 2002, Terbush-Fisher participated in a counseling intake form with Samaritan Counseling ("Samaritan").  T. 192.  Terbush-Fisher subjectively reported feeling sadness and anxiousness, specifically detailing the areas of concern in her life as her marriage, anxiety level, mood, and amount of sleep.  T. 192.  On December 17, 2002, Terbush-Fisher received counseling over the phone from Samaritan.  T. 187.[5] During the session, Terbush-Fisher revealed feeling that she was unsupported by her husband and grieving the recent death of her mother.  Id.  The next week, Terbush-Fisher attended another session and reported feeling better and that her husband was being more supportive.  Id.

On December 31, 2002, Samaritan completed an assessment form whereby Terbush-Fisher was noted to have a history of chronic fatigue, grief, mixed anxiety, and depression since that previous summer, which had been exacerbated by her mother's death in August.  T. 190, 277.  Her psychiatric history included limited outpatient counseling several years prior, and she reported being out of work due to her Epstein Barr Virus since 2002.  T. 190, 277.  The assessor commented that Terbush-Fisher was well-groomed, guarded, agitated, and anxious.  Id.  Terbush-Fisher still possessed an intact thought process and was not hallucinating or delusional.  Id.  While suicidal ideation and previous suicidal behaviors were present, there were no suicidal or homicidal plans or intent present and no perceived impairments by Terbush-Fisher.  T.

---

[5] Terbush-Fisher participated in many of these sessions via telephone because she had been diagnosed with Epstein Barr Virus a few months earlier and was too weak to travel to appointments.  T. 187.

184, 278.  Terbush-Fisher was fully oriented during the assessment and her memory, orientation, cognitive functions, and judgment were all intact; buther insight was impaired.  Id.  Ultimately, Samaritan concluded that Terbush-Fisher presented with mixed anxiety and a depressed mood.  Id.

On January 6, 2003, Terbush-Fisher cancelled her counseling appointment.  T. 187.  On January 13, 2003, Terbush-Fisher had a counseling session by telephone, reporting that she was feeling better, though still tired, and was angry and frustrated with her primary care physician for not "supporting her in her weakness and in not filling out her disability forms."  Id.  Terbush-Fisher's session on January 27 was rescheduled. Id.  In sessions on January 30, February 26, and March 5 Terbush-Fisher was generally feeling better but still felt unbalanced and depressed.  Id.

On March 17, 2003, Terbush-Fisher participated in another counseling session and reported feeling ill from her virus and upset at her long marriage of discomfort and conflict.  T. 187.  The following week Terbush-Fisher again requested a refill of her anti-anxiety medication.  T. 303.  On March 26, Terbush-Fisher participated in another telephone session and was described as "continu[ing] to present with moderate anxiety and depressed mood [though] denies suicidality [and remains fully] oriented . . . ."  T. 187.

On April 4 and 10, 2003, Terbush-Fisher did not answer her phone when Samaritan attempted to reach her.  T. 187-88.  However, her sessions on April 17 and 29 and May 8 resulted in notes concluding that Terbush-Fisher had "some reduction in her depression and anxiety [as she r]eport[ed] feeling secure in her new church family and better about her relationship with her husband."  T. 188.  Terbush-Fisher requested

8

another refill of her prescription on May 9.  T. 302.  A few days later she had an appointment with Baptist staff requesting a psychiatric evaluation but stating that she still felt "reasonably OK."  T. 301.

On June 11, 2003, Terbush-Fisher was "processing her anxiety and depression and h[istory] of not being happy for ten years . . . ."  T. 188.  On June 23, Terbush-Fisher reported that she had a "reduced depressed mood [and] moderate anxiety . . . ."  Id.  It was suggested that Terbush-Fisher see a psychiatrist for a medication evaluation for her ongoing anxiety issues.  Id.  In July, September, and October of 2003, Terbush-Fisher continued to refill her anti-anxiety prescriptions.  T. 299-300.  Due to her husband's illness, Terbush-Fisher missed appointments in August and September, but returned on September 8, "present[ing] with moderate mixed anxiety and depressed mood . . . ." and attempting to deal with her husband's illness and an unwelcome house guest.  T. 188.

On December 31, 2003, Terbush-Fisher was terminated from Samaritan's care.  T. 185, 276.  At that time, her Epstein Barr virus was in remission.  Id.  Her treatment goals included reducing her agoraphobic and depressive symptoms.  Id.  Treatment was terminated at Terbush-Fisher's request as she felt that she had reached as many goals as she presently could under Samaritan's care, while her therapist disagreed and recommended that she return to counseling if she needed additional assistance coping with the transitions in her life.  Id.

Throughout 2004, Terbush-Fisher continued to request and receive prescriptions for her anti-anxiety medication.  T. 297.  Before the Fall of 2005, Terbush-Fisher began receiving treatment from Dr. Hickey at Family Medical Care.  On October 18, 2005, Dr.

9

Hickey found that Terbush-Fisher was still using her anti-anxiety drug on "an intermittent basis," and her prescription was reissued.  T. 290.  Terbush-Fisher continued receiving treatment from Dr. Hickey for musculoskeletal issues and was seen by Dr. Hickey three times, and by the office four times, in nine months without mention of her anxiety.  T. 149-54, 283-88.

### 3. Anxiety Treatment After July 31, 2006

On July 31, 2006, Terbush-Fisher reported that she had experienced anxiety for ten years, experienced panic attacks, tried counseling to no avail, began taking prescription medication in 2002, has not worked for almost three years because of her nervousness around people, and forced herself to go outside lest she succumb to her fears of agoraphobia.  T. 148, 282.  Prior to taking medication regularly in 2002, Terbush-Fisher experienced panic attacks regularly and multiple times per day, but since beginning the medication the attacks had ceased.  Id.  Terbush-Fisher characterizing herself as "semi-functional" on her medication as it prevents full-on panic attacks from occurring.  T. 152, 286.  Terbush-Fisher reported that "[s]he d[id] not feel that she w[ould] be able to function in a work setting because of the difficulties with concentration and just generally being nervous."  Id.  Dr. Hickey noted that Terbush-Fisher was "managing herself on minimal medication at this point so we will keep things as they are," with the option of increasing the dosage if the symptoms worsened.  Id.

On November 22, 2006, Terbush-Fisher underwent her first mental status examination.  T. 107.  The results indicated that Terbush-Fisher's (1) appearance was good; (2) eye contact and speech were normal; (3) behavior was calm; (4) affect was

congruent; (5) concentration, memory, and thought process were intact; (6) alertness to person, place and time was appropriate; (7) conversations were coherent, clear, and logical; and (8) insight was good.  Id.  There were no signs of delusions or hallucinations.  Id.  Terbush-Fisher remained diagnosed with anxiety and agoraphobia which interfered with her daily functioning.  Id.  Accordingly, the assessor concluded that her results indicated that she was unable to work due to her panic attacks and that she required treatment for coping and management of her anxiety.  Id.  On December 1, 2006, a state agency physician, Dr. Weiss, declined to provide medical advice on the claim as there was insufficient information provided to him upon which to make a recommendation.  T. 236-51.

On December 20, 2006, Terbush-Fisher again consulted with Dr. Hickey reporting that she continued taking her prescription medication and had begun seeing a psychiatrist at Union Counseling Services.  Dr. Hickey recommended that Terbush-Fisher continue on her current medication and whatever other course of treatment the psychiatrist recommended.  T. 147.  Additionally, Terbush-Fisher indicated that she was pursuing a disability claim.  Id.  On December 22, 2006, Terbush-Fisher received a treatment plan from her counselor, R. Kelly, a social worker, seeking her to manage her depression in order to function more effectively, become comfortable in group environments and involved in group situations, enroll in course work to increase her marketability and satisfy her interest in education, and participate in a weight loss program to improve her confidence and image.  T. 105-06.  Terbush-Fisher was again diagnosed with anxiety disorder.  T. 106.

Terbush-Fisher continued to see her physician, but next mentioned anxiety on

March 22, 2007.  T. 102, 144-45.  Terbush-Fisher's goals remained the same, with an emphasis again on controlled weight loss, modification of self image, and social comfort in a group setting.  T. 102-04.  On May 25, 2007, Terbush-Fisher again consulted with Dr. Hickey about her anxiety, stating that she was still using one to two tablets of her medication per day and "had been doing very well," until her husband had a heart attack and she had a panic attack in the middle of the night.  T. 146.  Dr. Hickey recommended that she continue taking her medication as needed and supported Terbush-Fisher's decision to seek help from a psychologist, rather than from a social worker.  T. 146.

On July 18, 2007, a medical source statement regarding Terbush-Fisher's mental limitations was completed by a psychiatrist and Kelly, the social worker.  T. 174-75, 177-78.  The statement indicated that based on observation and medical reports, Terbush-Fisher had no limitations in her ability to understand, remember, or carry out instructions.  T. 174, 177.  It also indicated that Terbush-Fisher was (1) excellent at asking simple questions or requesting assistance and being aware of normal hazards; (2) good at interacting appropriately with the public, maintaining socially appropriate behavior, and adhering to standards of neatness and cleanliness; (3) fair at accepting instructions and responding appropriately to criticism, getting along with peers, and setting realistic goals; and (4) poor at responding to changes in the work setting or traveling to unfamiliar places.  T. 175, 178.  The assessors determined that Terbush-Fisher's interpersonal capabilities were impaired due to her work and social situations, her motivation was impaired due to her fear and avoidance issues, and her mobility was impaired due to her constant need to remain at home.  Id.  The clinical findings

12

indicated a diagnosis of anxiety disorder with symptoms of agorophobia, anxiety, and depression.  Id.

On September 22, 2007, Terbush-Fisher again met with Kelly, who continued to reiterate the same treatment goals with an emphasis on ceasing to live in her dysfunctional past, losing weight, and seeking enrollment in college courses.  T. 101.  Terbush-Fisher's diagnosis remained unchanged and the criteria for discharge included "becoming more comfortable and productive in [Terbush-Fisher's] daily activities."  T. 103.  Treatment notes with Dr. Hickey on October 31, 2007 indicated that Terbush-Fisher was still taking her anti-anxiety medication which was effectively preventing her from having significant panic attacks.  T. 141.  Dr. Hickey also recommended trying a new prescription, because Terbush-Fisher reported that it was still difficult to leave the house, to give her "more confidence to get out and try to maintain a full life . . . ."  Id.

On November 12, 2007, the psychiatrist and social worker that had previously completed the medical source statement regarding Terbush-Fisher's mental health reevaluated her case and concluded that nothing had changed.  T. 175.  On April 30, 2008, they completed another medical source statement.  T. 129-31.  Again, they concluded that Terbush-Fisher had no limitations understanding, remembering, or carrying out instructions in a workplace setting.  T. 129.  It was now determined that Terbush-Fisher would have (1) slight impairments interacting appropriately with the public and her supervisors; (2) moderate impairments interacting appropriately with co-workers and responding appropriately to work pressures; and (3) marked impairments responding appropriately to changes in a routine work setting.  T. 130.  Terbush-Fisher was still impaired with her mobility, motivation, and interpersonal skills.  Id.

13

On May 29, 2008, Dr. Hickey submitted a medical source statement regarding Terbush-Fisher's mental health.  T. 123-25, 136-38.  Dr. Hickey concluded that Terbush-Fisher had (1) no limitations in carrying out instructions; (2) slight limitations in understanding and remembering simple instructions; (3) moderate limitations in understanding and remembering complex instructions and interacting properly with her coworkers; and (4) marked limitations in carrying out complex instructions and making judgments, interacting with the public and her supervisor, and appropriately responding to a work environment or changes in that environment.  T. 123, 136.  "[P]anic and anxiety symptoms impair [Terbush-Fisher's] ability to work with others and . . . authority figures [and t]he stress of faster paces and changes in the environment exacerbate [her] underlying disorder."  T. 124, 137.  Dr. Hickey also noted Terbush-Fisher's inability to transport or do many of her activities of daily living by herself.  Id.

On June 11, 2008, Dr. Hickey sent Terbush-Fisher's counsel a letter explaining her medical condition.  T. 99.  Terbush-Fisher's anxiety was initially diagnosed in May 1995, she began taking medication in 2002, and due to personal challenges she also began attending counseling that same year.  Id.  Dr. Hickey concluded that "function, work and lifestyle limitations pertaining to these diagnoses . . . are documented as existing from 2002 to present.  While she still utilizes prescribed medication and assistance from mental health professionals, she continues to be chronically challenged by these debilitating disorders."  Id.

### 4. Musculoskeletal Impairments

In 1989, Terbush-Fisher filed a worker's compensation claim for a low back

strain that she developed after falling at work.  T. 194-96.  The injury was determined to

be "soft tissue damage" and Terbush-Fisher was advised to take over-the-counter pain

medication.  T. 198.  However, Terbush-Fisher also received paid benefits to see a

chiropractor as necessary.  T. 154, 288.  In 1990, Terbush-Fisher again sought medical

treatment after injuring her knee when she fell at work.  T. 200-04.  In July 1997,

Terbush-Fisher was seen by an orthopaedist about radiating hip pain which impaired

ambulation and which was eventually diagnosed as sciatica, secondary to a herniated

disc and mild degenerative changes.  T. 206-08.

On February 17, 2006, Dr. Hickey saw Terbush-Fisher due to her complaints of

neck pain.  T. 154, 288.  It was noted that she had recently seen the chiropractor,

remained in pain after the adjustment, and did not have full range of motion in her neck.

Id.  Dr. Hickey recommended ibuprofen and moist heat to relax the muscles.  Id.  On

March 10, 2006, Terbush-Fisher had an x-ray of her cervical spine which showed

"degenerative spurring . . . without significant associated disc space narrowing,"

indicative of mild arthritis.  T. 158.  A few weeks later, Terbush-Fisher was again seen

by Dr. Hickey for her ongoing neck pain for which she was prescribed a muscle

relaxant, ibuprofen, and physical therapy.  T. 151, 153, 284, 287.  Terbush-Fisher

reported relief from the muscle relaxant and pain reliever, but did not want to "have to

rely on them long-term."  T. 153, 287.

On May 25, 2007, Dr. Hickey completed a medical source statement regarding

Terbush-Fisher's physical abilities.  T. 169-72, 179-82.  Terbush-Fisher was limited to

(1) occasionally and frequently lifting less than ten pounds; (2) standing and walking

less than two hours in an eight hour workday; (3) occasionally reaching as her back

15

injury precludes her from holding a position of reaching over her head; (4) sitting less than six hours in an eight hour workday and needing the ability to periodically alternate between sitting and standing; (5) occasionally pushing and pulling with both lower and upper extremities; (6) never climbing, crawling or stooping; (7) occasionally balancing, kneeling, and crouching; and (7) slight exposure to temperature extremes, dust, humidity, hazards, and fumes due to her asthma and allergies.  Id.  On October 31, 2007, Dr. Hickey completed another medical source statement reaching the same conclusions as outlined above.  T. 169-72.

On February 14, 2008, Terbush-Fisher began physical therapy.  T. 113.  On March 13, 2008, x-rays of her lumbar spine indicated mild degenerative disease and spurring in the back.  T. 97.  An MRI several weeks later also revealed degenerative disc disease with a moderate to large disc bulge, a moderate bulge and a prominent disc protrusion in the lumbar area resulting in "foraminal compromise and central stenosis."  T. 134.  On May 2, 2008, Dr. Hickey completed another medical source statement.  T. 119-22.  The lifting, carrying, sitting, standing, pushing, pulling, reaching, and environmental limitations remained the same.  T. 119-20.  However, Dr. Hickey expanded the limitations by finding that Terbush-Fischer could not  stand for more than fifteen to twenty minutes at a time or sit more than thirty minutes at a time.  T. 120. Additionally, Terbush-Fisher was no longer able to climb, balance, kneel, couch, crawl or stoop due to her back and knee injuries and obesity.  Id.  It was also noted that Terbush-Fisher was attending physical therapy, a neurologist, and using a therapeutic device at home.  Id.  That same day, Terbush-Fisher also received a prescription for crutches for the degenerative disc disease in her lumbar spine.  T. 127, 128, 135.

16

Terbush-Fisher attended physical therapy twenty-one times between February and May of 2008.  T. 114.  On her date of discharge, Terbush-Fisher's sacroilliac joint was moving more easily though her range of motion was normal and the therapists objectively concluded that Terbush-Fisher had plateaued in the amount of relief she was going to receive from physical therapy.  T. 116.  The physical therapists also submitted a medical source statement regarding Terbush-Fisher's physical limitations.  T. 109-12.  The physical therapist concluded that Terbush-Fisher (1) could occasionally lift ten pounds, but frequently lift less than ten pounds; (2) was affected by a walking impairment which required a hand held device to assist with ambulation; (3) was affected by her impairments while sitting, making it necessary for her to periodically alternate between sitting and standing to alleviate pain; (4) had poor conditioning and limited tolerance for physical activity; (5) could occasionally climb, balance, crouch, and stoop; (6) could never kneel or crawl; and (7) had no manipulative, visual, communicative, or environmental limitations.  T. 109-112.

### B. Terbush-Fisher's Testimony

In September 2006, Terbush-Fisher completed her disability report forms which outlined her daily activities including completing her personal grooming and light housework (i.e. making the bed, washing the dishes, doing the laundry) in the morning, checking her electronic mail and taking care of personal affairs in the afternoon, and reading, watching television or talking to friends on the telephone during the evening.  T. 63. Terbush-Fisher reported that she lived with, and took care of, her husband by completing the typical duties of a housewife including laundry and cooking light dinners.

17

T. 63.   She required assistance with carrying the laundry baskets and scrubbing the

bath tubs though.  T. 64-65.  Terbush-Fisher reported that she could take care of her

own hair and toileting and feed herself, though.  T. 64.  Additionally, she could shop

independently, although she normally did not, for about an hour a week.  T. 65.  She

was also able to pay bills, count change, and balance a check book, although her

husband handled their finances.  T. 66.  Terbush-Fisher attended church, participated

in home study groups, and talked with her friends on the telephone several times a

week.  T. 67.  She used a cane occasionally when her leg acted up or when she was

walking long distances.  T. 68.

Terbush-Fisher's main complaint was anxiety.  T. 70.  Terbush-Fisher reported

on her forms that she used to experience full panic attacks every few days, with

constant feelings of anxiety, but that since she began taking her medication in 2002

things had improved.  T. 71.  She also used relaxation techniques though she reports

leaving home infrequently because it was too difficult for her to cope outside of her

environment.  T. 72.

During her testimony on June 5, 2008, Terbush-Fisher restated that she drove

very little but could run errands on her own, although she prefers not too.  T. 356, 368.

She remained married and lived with her husband and performed the housework and

cooked simple meals.  T. 369.  She reiterated her medical history as (1) a mid-back

injury from 1987 which has progressively deteriorated and gotten much worse in the

last six months and (2) panic attacks which began in 1995, the length and severity of

which fluctuated and were exacerbated in 2002 when her mother passed away.  T. 366-

67.  However, Terbush-Fisher indicated that she did not start taking prescription

18

medication or using therapeutic machinery for her back until February 2008.  T. 363-64.

Prior to 2008, over-the-counter pain relievers had kept her comfortable.  T. 363.

Terbush-Fisher also reported that she had difficulty concentrating and that she was not

sharp as she used to be, as she tended to miss, forget, or misplace things.  T.  369-70.

Additionally, she felt that she could not work alone in an office "[b]ecause [she] would

feel confined like [she] ha[d] to get out of there," and that receiving any type of criticism

from a supervisor would bring her to tears.  T. 369-71.


### C. Treating Physician Rule

Terbush-Fisher contends that the ALJ failed properly to credit the opinions of her

treating physicians and should have requested further information from her treating

physician to fill the gaps in the record.

When evaluating a claim seeking disability benefits, factors to be considered

include objective medical facts, clinical findings, the treating physician's diagnoses,

subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret.

Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating

source.  Under the regulations, a treating source's opinion is entitled to controlling

weight if well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is inconsistent with other substantial evidence in the record.  20 C.F.R.

§ 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  "This rule applies equally to

retrospective opinions given by treating physicians."  Campbell v. Astrue, 596 F. Supp.

2d 445, 452 (D. Conn. 2009) (citations omitted).  Before a treating physician's opinion

can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

In this case, the ALJ determined that Terbush-Fisher (1) was last insured on June 30, 2006; (2) suffered from the severe impairments of anxiety with panic disorder, depression, and a cervical disorder; (3) did not have an impairment which was per se disabling; (4) had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b); (5) could not perform her previous work because it was a semi-skilled position and her mental impairments required that she work in an unskilled environment; and (6) sufficient jobs remained in the economy so that she could have been employed. T. 13-21. In determining that she retained the RFC to perform unskilled work, the ALJ gave the treating physician's May 2008 Medical Source Statement and letter, which classified Terbush-Fisher's limitations as marked and highly restrictive, little weight. T. 18. Terbush-Fisher argues this was incorrect; however, the medical evidence of record

supports the fact that she was not suffering from marked and restrictive limitations at that time.

The ALJ's opinion concluded that Terbush-Fisher's treating physician, Dr. Hickey, presented opinions which were neither supported by, or consistent with, the medical record as a whole.  T. 18-20.  For the reasons discussed below, this conclusion was supported by substantial evidence.

### 1. Anxiety Disorder

It is undisputed that Terbush-Fisher was diagnosed with panic and anxiety as of May 1995.  The condition exacerbated in 2002 and Terbush-Fisher began taking anti-anxiety medication and attending mental health counseling sessions.  T. 186-92, 277-79, 299.  Upon presentation at her counseling sessions, medical notes indicate that Terbush-Fisher had "mild mixed anxiety and depressed mood," which is inconsistent with Dr. Hickey's assessment that her anxiety was marked and highly restrictive.  T. 186.

Dr. Hickey's own medical notes also indicated inconsistencies with her 2008 conclusions.  In October of 2005, Dr. Hickey noted that Terbush-Fisher was using her anti-anxiety medication only on an intermittent basis.  T. 290.  Terbush-Fisher continued to be seen regularly by Dr. Hickey in 2004, requesting refills of her anti-anxiety medication, but there were no notations in her medical records about any issues which had developed since ceasing her mental health counseling in 2002.  This supports the conclusion that Dr. Hickey's 2008 assessment that Terbush-Fisher had been highly affected by her depression since 2002 overstated Terbush-Fisher's

condition given Dr. Hickey's own personal notes in 2004 and 2005.

Moreover, discussion regarding Terbush-Fisher's anxiety did not become a staple of conversation until July of 2006, when the two began discussing and completing the necessary disability forms.  Even in July of 2006, Dr. Hickey's notes indicate that the prescription medication had been keeping Terbush-Fisher "semi-functional" as it had prevented any full-blown panic attacks since 2002 when she began taking the medication.  T. 152, 286.  Dr. Hickey also noted that Terbush-Fisher was "managing on minimal medication," indicating that they would continue on the current course.  Id.  Such comments are inconsistent with Dr. Hickey's later characterizations that Terbush-Fisher had marked decreases due to her anxiety and severe restrictions in her abilities.

Moreover, in November of 2006, a few months after her insured status had expired, a mental status exam of Terbush-Fisher produced benign results characterizing her interactions with the assessor as normal and calm, with an intact thought and memory process, ability for coherent and thoughtful conversation, and no delusions or hallucinations.  T. 107.  While it was concluded that Terbush-Fisher suffered from anxiety and agoraphobia which interfered with her daily functioning.  Id. Such objective findings indicate that Terbush-Fisher was not markedly restricted. See Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008).

The ALJ discussed the subsequent mental health treatment plans and medical source statements, but they were entitled to little weight because they were all offered significantly after the last date of insured.  As previously discussed, a claimant must prove a disability between the date of onset, in this case January of 2005, and the date

of last insured, in this case June of 2006.  Accordingly, matters occurring after that time period carry limited relevance.[6]

Accordingly, the ALJ considered all the evidence submitted by Dr. Hickey and properly determined not to give her 2008 Medical Source Statement and letter controlling weight because it was neither supported by, nor consistent with, the medical evidence.  Therefore, the ALJ's decision to rely on Dr. Hickey's contemporaneous notes, mental health counseling notes, and the State Disability Examiner's opinions provided substantial evidence upon which to base the final decision.  Therefore, the ALJ's decision not to accord significant weight to the treating physician's opinion was supported by substantial evidence and the Commissioner's decision will not be overturned on ths ground.

---

[6]The ALJ stated that he considered such opinions, which were also inconsistent with Dr. Hickey's analysis.  T. 18.  The Mental Medical Source Statement completed in July of 2007 by a psychiatrist and social worker, both mental health experts, found that Terbush-Fisher had no limitations in her ability to understand, remember or carry out instructions, that she was excellent at asking simple questions and good at interacting appropriately with the public and maintaining socially appropriate behavior, and was only poor at to responding to changes in her work setting or traveling to unfamiliar places.  T. 175, 178.  These same findings were reiterated in November of 2007, shortly before Dr. Hickey's 2008 conflicting assessment citing marked restrictions.  Despite Terbush-Fisher's arguments to the contrary, the ALJ must to consider whether or not the medical opinion comes from a specialist, "generally giv[ing] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527 (d)(5).

### 2. Musculoskeletal Impairments

In February of 2006, Terbush-Fisher received treatment from Dr. Hickey regarding complaints of neck pain.  T. 154, 288.  These were the first documented complaints.  Terbush-Fisher underwent x-rays which showed an objective diagnosis of mild arthritis.  T. 158.  Such conclusions are inconsistent with any highly restrictive physical limitations.  Moreover, these complaints subsided with over-the-counter pain medication.  T. 363.

The severity of Terbush-Fisher's musculoskeletal complaints, or lack thereof, was also supported by her subjective statements on her disability application form.  T. 17.  On the Adult Functioning Report, completed a month after her date of last insured, Terbush-Fisher reported that she could independently tend to her personal needs, perform light housekeeping duties like cooking, laundry, doing dishes and making the bed, work on her computer, shop in stores on a limited basis in person and an unlimited basis online, read, watch television, and attend to her personal financial affairs.  T. 63-67.  Additionally, while Terbush-Fisher occasionally had to use a cane to walk long distances, she reported being fully capable of walking medium distances without assistance.  T. 68.  These activities are inconsistent with Dr. Hickey's 2008 contentions that Terbush-Fisher was markedly limited in her physical abilities.

Also, Terbush-Fisher's testimony indicated that she did not begin taking prescription medication for her back and musculoskeletal pain until February of 2008.  T. 363-64.  This was well after her date of last insured.  Additionally, while physical therapy was recommended and prescribed, Terbush-Fisher did not attend an evaluation until February of 2008, almost two years after her date of last insured.  T.

113.  Although an impairment may have existed prior to the claimant's insured status expiring, evidence that the impairment worsened to become disabling after the insured status expired cannot serve as a basis for disability.  <u>Arnone v. Bowen</u>, 882 F.3d 34, 37-38 (2d Cir. 1989) (citations omitted).  Additionally, Terbush-Fisher's failure to seek treatment until two years after it was originally prescribed serves as another "one of a number of pieces of evidence that, collectively, gave [the ALJ] reason to discredit [Dr. Hickey's] retrospective opinion."  <u>Campbell</u>, 596 F. Supp. 2d at 454.  Moreover, Terbush-Fisher fails to proffer any reasons why she delayed in pursuing such treatment; therefore, such negative inferences are not precluded.  <u>Id.</u>  ("[A]n ALJ may not draw negative inferences from a claimant's lack of treatment without considering any explanations the claimant may provide.") (citations omitted).

Accordingly, the ALJ's decision not to accord Dr. Hickey's 2008 Medical Source Statement controlling weight was  supported by substantial medical evidence and the Commissioner's decision will not be disturbed on this ground.

### 3. Gap in the Record

Additionally, Terbush-Fisher contends that, to the extent that the ALJ was correct in failing to give credit to Dr. Hickey's assessments, there was a gap in the record which the ALJ was responsible for filling since there was no conclusive proof from any treating physician that Terbush-Fisher could continue to work.  While an ALJ has a duty to develop the record, <u>Hopper</u>, 2008 WL 724228, at *11, a plaintiff has the burden to prove every fact through Step Four of the disability analysis which encompasses the current determination.  The ALJ did not fail to discuss what evidence he relied upon, or

where substantial evidence proffered by Terbush-Fisher's treating physician which was ignored.  Dr. Hickey's 2008 assessments were inconsistent with the medical record.

However, the medical record contained substantial evidence composed of Dr. Hickey's previous treatment records, prior counseling records, and Medical Source and Mental Status examinations.  This data constituted substantial objective support for the ALJ's current decision.  20 C.F.R. § 416.912(e); see also Hopper, 2008 WL 724228, at *11 (holding that when there is "little to no evidence in the record to determine [a plaintiff's] RFC properly, the ALJ should at least have attempted to contact [the plaintiff's] treating physicians . . . .").  Thus, the treating physicians' opinions here were properly rejected  and the ALJ relied on the evidence available.  "If more information was needed from [the] treating and examining physicians . . . it was [Terbush-Fisher's] burden to introduce that evidence."  Hall v. Astrue, No. 08-CV-2002, 2009 WL 426539, at *4 (E.D. Ark. Feb. 20, 2009).

Accordingly, the Commissioner's decision in this regard is affirmed.


### E.  Subjective Complaints of Pain

Terbush-Fisher contends that the ALJ's decision to discredit her subjective complaints of disability was in error as he failed to include an appropriate credibility assessment in his analysis.

The ALJ determines whether an ailment is an impairment based on a two-part test.  First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r

of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).

This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529

(2003).  "'Second, if the medical evidence alone establishes the existence of such

impairments, then the ALJ need only evaluate the intensity, persistence, and limiting

effects of a claimant's symptoms to determine the extent to which it limits the claimant's

capacity to work.'"  Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc.

Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept.

11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which

these symptoms are consistent with the medical and other evidence.  20 C.F.R. §

404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability

where a medically ascertained impairment is found, even if the pain is not corroborated

by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983)

(citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability

requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d

1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally

difficult to disprove" and courts should be reluctant to constrain the Commissioner's

ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In

the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make

credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v.

Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the

claims of disabling pain so long as the ALJ's decision is supported by substantial

evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Terbush-Fisher's "allegations [were] . . . mostly credible[; h]owever, in light of the evidence . . . and the limited time period in which [Terbush-Fisher has] to establish her disability . . . the record . . . does not support a finding of disability."  T. 17.  Specifically, the ALJ pointed to Terbush-Fisher's testimony as conflicting with her allegations.  Id.  Her testimony outlined daily activities

28

including the ability to care for herself, perform light housework, interact with friends and family, shop, work on the computer, read, watch television, and maintain her financial affairs. Id. These activities contradicted Terbush-Fisher's allegations that she was unable to perform any work functions. Additionally, the ALJ discussed the lack of objective medical evidence establishing more than mild arthritis in her neck. Id. Moreover, it was undisputed that these ailments had existence for years and that Terbush-Fisher continued to function on over-the-counter pain medication and continue attending work.

The bases for the ALJ's credibility determination were supported by substantial evidence. Terbush-Fisher testified that she was the primary homemaker. These physical capabilities are inconsistent with complaints of a total inability to function in a workplace environment. Additionally, Terbush-Fisher's relevant diagnostic study was relatively unremarkable. This is consistent with her testimony of being able to complete the household chores. Moreover, she testified that she continued to speak to friends and family on a daily basis, enjoyed reading and watching television, and could still look after her home and her personal and financial needs. This testimony is inconsistent with contentions that Terbush-Fisher was mentally unfit to continue working.

Therefore, based on Terbush-Fisher's testimony and the relevant medical evidence, substantial evidence supports the ALJ's determinations. The decision of the Commissioner on this ground is affirmed.


**F. RFC**

Terbush-Fisher contends that there exists insufficient evidence in the record to

support the ALJ's findings regarding her RFC.  Terbush-Fisher also contends that the

ALJ should have obtained expert testimony from a vocational expert concerning his

non-exertional limitations, instead of incorrectly applying the Medical-Vocational

Guidelines.

RFC describes what a claimant is capable of doing despite his or her

impairments considering all relevant evidence, which consists of physical limitations,

symptoms, and other limitations beyond the symptoms.  Martone v. Apfel, 70 F. Supp.

2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945.  "In assessing RFC, the

ALJ's findings must specify the functions plaintiff is capable of performing; conclusory

statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d

at 150.  RFC is then used to determine whether the claimant can perform his or her

past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913

(2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).  The Second Circuit has

clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined

"the Commissioner need only show that there is work in the national economy that the

claimant can do; he need not provide additional evidence of the claimant's [RFC]."

Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).[7]

Here, the ALJ found that Terubsh-Fisher retained the RFC to perform unskilled

_____

[7] As Pourpre states, these "new regulations abrograte the Curry v. Apfel
standard of review and clarify that there is only a limited burden shift to the
Commissioner at step five."  566 F.3d at 306.  As these regulations came into effect in
2003, and Terbush-Fisher contends that her onset of disability was in 2005, the
aforementioned abrogation applies and Terbush-Fisher has relied upon an
inappropriate standard to allege that the ALJ improperly relied upon the Medical-
Vocational Guidelines.  See Pl. Mem. of Law (Dkt. No. 10) at 20-21.

and simple entry level light work.  T. 16-17.

> Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking . . . or when it involves sitting most of the time with some pushing and pulling of arm or leg controls . . . If someone can do light work, . . . he or she can also do sedentary work, unless there are additional limiting factors such as a loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  Additionally, unskilled work is defined as:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-15, at *4.  The ALJ's assessment of Terbush-Fisher's RFC is supported by substantial evidence in the record.

The ALJ properly determined from Terbush-Fisher's testimony and activities of daily living, including her ability to tend to her personal and household needs, that there were no indications that she was unable to perform the physical demands of a light duty job.[8]  The only non-exertional limitation Terbush-Fisher had related to her was her poor

---

[8] Determined after the date of onset, Dr. Hickey's own Physical Medical Assessment from May 2007 supports this conclusion as she indicates Terbush-Fisher could sit for six hours of the work day, stand for two, and intermittently switch between the two postures.  T. 169-71.  Additionally, she found that Terbush-Fisher could push and pull levers with some limitations and generally reach in all directions.  T. 170-71.

responses to high stress and major changes in the work place environment requiring a low stress, unskilled work setting.  However, the mental health treatment notes, Dr. Hickey's assessments, the Mental Medical Source Assessments, and Terbush-Fisher's reports of doing well on her prescription medication all indicate that she was still suited for unskilled labor as she had no issues with understanding, remembering, or carrying out simple instructions or appropriately interacting with people.

Additionally, the record indicates that Terbush-Fisher's diminished capacity for adapting to change was not properly categorized as a substantial loss of ability which would severely limit her potential occupational base.  See Berrardo v. Astrue, 2010 WL 3604149, at *5-6 (N.D.N.Y. May 26, 2010) (affirming ALJ's decision that claimant could perform unskilled labor in spite of her major depressive and anxiety disorder which gave her difficulties maintaining a regular schedule and making appropriate decisions because the medical evidence did not establish that claimant was unable to perform this functions and the overall evidence indicated nothing more than "mild to moderate difficulties," which supported a conclusion of unskilled work).  Instead, the medical record indicates that as of the date of last insured, Terbush-Fisher had remained stable and well-maintained on her anti-anxiety medication since 2002.   Thus, all of the relevant evidence in the record supported the ALJ's RFC determination for the reasons outlined above.  20 C.F.R. § 404.1545(a)(1).  As these "fact[s are] supported by substantial evidence, [they are deemed] conclusive . . . ." 42 U.S.C. § 405(g).

---

These findings were affirmed by Dr. Hickey in October of 2007 (T. 172) and modified in May of 2008 with a notation that her back injury had been exacerbated in January of 2008 (T. 119).  Therefore, for the relevant time period, Dr. Hickey's contemporaneous notes support the physical RFC findings.

The ALJ then conducted his Step Five analysis. "[T]he ALJ [i]s required to perform a two part process to first assess [Terbush-Fisher's] job qualifications . . . and then determine whether jobs exist in the national economy that [she] could perform . . . [which] is generally satisfied by referring to the applicable rule of the Medical-Vocational Guidelines ("the Grids") . . . ."  See Dehnert v. Astrue, No. 07-CV-897, 2009 WL 2762168, at *11 (N.D.N.Y. Aug. 24, 2009).  In this case, it was  determined that given Terbush-Fisher's age, education, and work experience, in conjunction with the previously determined RFC, her condition corresponded with the Grids, specifically Medical-Vocational Rule 202.21.  Id., 2009 WL 2762168, at *12 (explaining that the Grids "classifies work into five categories based on the exertional requirements of the different jobs," and that "[u]pon consideration of a claimant's [RFC], age, education, and prior work experience, the Grid yields a decision on [disability] . . . .").  If the claimant's characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he or she is disabled.  20 C.F.R. § 404.1569; Pratts v Chater, 94 F.3d 34, 38-39 (2d Cir. 1996).  Terbush-Fisher's characteristics did and she was determined not to be disabled pursuant to the Grid.  T. 20-21.  Furthermore, even considering Terbush-Fisher's non-exertional limitations, the ALJ determined that these had little effect on the occupational base of unskilled, light work which was available to Terbush-Fischer. Thus, there was no change in the ultimate determination of disability.  T. 21.

Terbush-Fisher argues that because she had a mix of exertional and non-exertional impairments, the services of a vocational expert were necessary to determine which jobs she could perform.  Pl. Mem. of Law at 20-21.  However, the Second Circuit has determined that reliance on the Grids is appropriate so long as the full range of jobs

is not limited by the claimant's non-exertional impairments.  Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986).  Thus, application of the Grid proceeds on a "case-by-case basis" so that "where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate." Id. at 605-06.

Here, the ALJ properly found that the non-exertional limitations, including Terbush-Fisher's ability to only perform unskilled work, did not significantly limit her occupational base provided by the Grid.  This is because the Grid is based upon unskilled jobs.  20 C.F.R. Part 404, Subpart P, Appx 2, § 202.00(a) ("Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy.").  Accordingly, the ALJ was permitted to rely upon the Grid.  See Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010) (affirming ALJ's decision that claimant's "mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision."); Dehnert, 2009 WL 2762168, at *12-14 (holding that the ALJ properly used the Grids where he found that the claimant's occupational base had not been significantly limited by his non-exertional mental impairment because it had little to no effect on the availability of unskilled work).  Rather, it was Terbush-Fisher's burden to establish that these non-exertional impairments significantly impacted her ability to comply with the requirements for light, unskilled jobs.  See Pourpre, 566 F.3d at 306 ("Under the applicable new regulation, the Commissioner need only show that there is work in the national economy that the claimant can do . . . .").  Accordingly, Terbush-

34

Fisher has failed in her burden.  Moreover, for the reasons stated above, the record

establishes that there was other work in the economy that Terbush-Fisher could have

performed during the relevant period which further supports the conclusion that she was

not disabled before the expiration of her insured status.

Therefore, the Commissioner's decision on this ground should be affirmed.


### VI. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the Commissioner's decision denying disability benefits is

**AFFIRMED**.


DATED:   September 24, 2010
         Albany, New York

_United States Magistrate Judge_

35